

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00371-CV

**IN THE INTEREST OF L.B.M.** and L.B.M., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-02077
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Rebecca Martinez, Chief Justice
               Luz Elena D. Chapa, Justice
               Beth Watkins, Justice

Delivered and Filed: January 13, 2021

AFFIRMED

Mother[1] and Father appeal an order terminating their parental rights to their two daughters,

L. (born in February 2015) and L.B. (born in July 2016). The sole issue is whether sufficient

evidence supports the trial court's findings that termination of Mother's and Father's parental

rights is in the children's best interest. We affirm the trial court's order.

## BACKGROUND

On October 11, 2019, the Texas Department of Family & Protective Services filed an

original petition seeking removal and conservatorship of the children, and termination of Mother's

and Father's parental rights. The children were removed based on allegations of neglectful

---

[1] To protect the identities of the minor children, we refer to the appellants by fictitious names and the children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

supervision, including concerns about suspected drug use and the daughters' inappropriate or lack of clothing. They were placed with their maternal grandmother.

The case proceeded to a bench trial on July 14 and July 16, 2020. Six witnesses testified, including Mother, Father, caseworkers, the children's maternal grandmother, and their seventeen-year-old brother. The trial court admitted into evidence three orders it had rendered during the case.[2] After trial, the trial court signed a final order terminating Mother's and Father's parental rights. The trial court found Mother and Father constructively abandoned the children, failed to comply with court-ordered provisions of their family service plans, and used drugs in a manner that endangered the children and then failed to successfully complete a rehabilitation program or relapsed. The trial court also found by clear and convincing evidence that termination of Mother's and Father's parental rights is in the children's best interest. Mother and Father timely appealed.

### SUFFICIENCY OF THE EVIDENCE

To terminate parental rights, a trial court must find by clear and convincing evidence one of the statutory predicate grounds and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). Because Mother and Father do not challenge the findings of predicate grounds for termination, we consider only whether legally and factually sufficient evidence supports the best-interest finding, applying our familiar standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263–67 (Tex. 2002).

In determining the best interest of a child, courts apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present

---

[2] The trial court also admitted segments of footage from a security camera mounted above the door of the family's apartment, showing an occasion on which the police accompanied a caseworker during an investigation. Most of the comments made on the video recording are inaudible, and the clips, which are approximately 10-15 seconds each, are not continuous.

and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

## A. Summary of the Evidence

One of the orders admitted into evidence was an October 23, 2019 temporary order following the full adversary hearing. In the temporary order, the trial court found Mother's and Father's conduct endangered the physical health or safety of the children; remaining in Mother and Father's home was contrary to the children's welfare; there was an urgent need for protection of the children that required immediate removal; and reasonable efforts were made to enable the children to return home, but there was a substantial risk of continuing danger to the children at home. The second order was a December 10, 2019 status hearing order, finding Mother and Father failed to review and sign their family service plans, and finding it necessary for the children's health and safety for any visits with the children to be supervised visits. The third order was another December 10, 2019 order, which directed Mother to immediately submit to a drug test.

Jessica Canabal, the caseworker involved in the children's removal, testified the Department received a referral on October 4, 2019, alleging neglectful supervision of the children based on "a strange chemical smell coming from the home." Canabal stated she visited the home and Mother was "wearing black latex gloves. She indicated that she was packing, as they had been evicted from the home and needed to be out by the end of the day." Mother denied using drugs and refused a drug test, but explained she was using a cleaning solvent made of vinegar and hydrogen peroxide. Canabal explained the children were observed not wearing diapers or

underpants and were asleep, "very hard to wake up," and "completely incoherent." Canabal also testified Father stated he had a history of using methamphetamines, but last used drugs before L.B. was born; Father also refused a drug test.

Canabal further testified she visited the home again several days later with law enforcement officers. The children were asleep and not wearing any pants, diapers, or underwear, and their eyes were noticeably dilated. Canabal stated the home was in disarray with cleaning solvents throughout the apartment, and she again smelled the pungent odor. Father admitted he had used methamphetamines the day before Canabal's October 4, 2019 visit, and Father and Mother were arrested for possession of drug paraphernalia during the second visit. Canabal described Father and Mother as uncooperative, not very forthcoming, and unwilling to accept responsibility regarding the conditions of the home and their drug use. She also stated the children's maternal grandmother reported Mother was bleaching the children's hair. Canabal admitted she did not recall many other details about the residence when she visited. She also admitted it would be normal for someone cleaning their home before moving to wear latex gloves, for there to be cleaning solvents, and for the home to appear in disarray. Canabal further stated there were no other concerns about the children's physical condition or health.

Linda Garza, a permanency specialist, testified Mother and Father had a CPS history when L. was "very small." Although Garza could not recall why the Department was involved at that time, she did recall Mother and Father were not cooperative in completing their services. Garza testified she became involved in this case in October 2019, and the children were very shy, but talkative, smart, and "very bonded with the grandparents." Garza opined the grandparents were providing a stable home, explaining the children had a routine, were in school, and involved in extra-curriculars including dance and gymnastics.

Christina Ramirez, a caseworker, testified Mother was uncooperative, changed her phone number at least four or five times during the case, and did not start engaging in services until March or April 2020. Ramirez testified Mother was ordered to complete services including a psychological evaluation, individual therapy, drug tests, a drug assessment, and parenting classes, and to obtain and maintain appropriate housing and employment; however, at the time of trial in July 2020, Mother had completed only a drug assessment and a psychological evaluation. According to Ramirez, Mother's explanation for not getting drug tested was that she lacked Texas-issued identification. Ramirez asked Mother to obtain identification for drug tests, and Mother stated she was in the process of obtaining identification, but never obtained or produced her identification to be drug tested. Ramirez also testified Mother was court ordered to submit to drug testing, for which Mother did not need identification, but Mother refused and gave no explanation.

Ramirez further testified she was unable to assess Mother's housing because Mother "doesn't have her own residence. She lives with her ex-husband, which [Mother] has not been honest about. [Mother] told me that it was her residence. And I later found out that it's not her residence, it's her ex-husband's residence. She's never had a residence of her own during the pendency of this case." Ramirez stated Mother reported being employed, but Mother was unable to provide any proof of employment. According to Ramirez, Mother attended 30-40% of in-person visits with the children, but then maintained contact because the visits were virtual; however, Mother never called Ramirez to ask about the children's welfare or provided any support to the children during the case.

Ramirez testified Father was ordered to "to complete a psychological evaluation, parenting classes, individual therapy, drug tests, obtain and maintain appropriate housing, employment, and drug treatment," but completed only a psychological evaluation, did not complete drug treatment, refused drug tests, and started a parenting course four or five weeks before trial. According to

Ramirez, Father's reason for not completing his services was that he was arrested on two outstanding warrants and transferred to a jail in Dallas County. Ramirez stated she informed Father about his outstanding arrest warrants, but Father denied or refused to acknowledge the warrants. Ramirez stated Father was on probation for a "possession" charge, and his probation was revoked after he was arrested for possessing drug paraphernalia. Father was incarcerated from December 2019 to May 2020, and did not start his services before going to jail. Ramirez stated Father never provided information about the services in which he was participating while on probation, did not submit to drug tests, was living with Mother and her ex-husband, provided a work schedule without proof of income, did not support the children during the case, and had only one face-to-face visit with the children.

Ramirez also opined the children were thriving in their grandparents' care. She stated the children were "bubbly, happy, talkative," attending all their appointments, and excited about school. Ramirez also testified the children were in play therapy because they were exhibiting inappropriate sexual behavior. She further testified the children were bonded and interact well with Mother and Father, as well as their grandparents. However, Ramirez noted that Mother and Father were charged with kidnapping L.B. from her grandmother's care "during another legal case."

The children's maternal grandmother testified she did not have any issues with the children not wearing underwear, and the children would recoil during their baths and would and say, "No bleach, no bleach." She also observed age-inappropriate sexual behavior. The grandmother also stated:

> My concern is repetition of the past several years, the drug use, the refusal to admit drug use. And when the children are returned to them, it resumes. And then the visits stopped, so I have no way of even monitoring to see if the children are being appropriately looked after.

This concern was based on her observations of Mother and Father's behavior and appearance:

It's really very obvious to me when things such as meth [have] been used. The change in the appearance of the parents. The -- Just the whole behavior thing, it's very -- It's up, it's down, it's great, then it's calmed down. It's just, like, you know, an up and down, up and down sort of behavior. And then lots of sleep after about three days of real maniacal cleaning and scrubbing, and then it's crash, you know, for several days off and on. A lot of sleep.

. . . .

[During the virtual visits] I see that the -- There is a very groggy appearance at times on the video. Early in the video talks, the virtual talks, we could never reach them during the day. It was only evening. They were not working at the time. It's the appearance. I know my -- my daughter's appearance, and this did not look natural.

The grandmother also confirmed Mother and Father removed L.B. from her care without her consent, but doubted formal charges were filed.

Mother testified she and Father have been together for nine years and have a common law marriage. Mother opined the children should not have been removed from her because the grandmother's allegations were unfounded, and she had called CPS "countless times," both for the children in this case and Mother's other children. Mother explained L.B. was going through a phase in which she did not want to wear any underwear, the pungent odor was the cleaning supplies, and the apartment was messy because they were moving. She also testified that while she had drug problems four or five years ago, she addressed those issues and no longer had a drug problem. Mother stated she, Father, and the children moved to San Antonio, first stayed in a hotel, then lived with Mother's ex-husband, then lived in an apartment, then moved back in with Mother's ex-husband temporarily, and then moved to a new apartment in March 2020.

Mother also contradicted the Department's evidence, testifying she was cooperative with the Department, the children's eyes were not dilated during the second visit, she did not bleach the children's hair, and she and Father did not possess drug paraphernalia: "My husband is a glass blower and we have -- we had old glass, broken glass. We had all sorts of glass. And that still

happened to be around. And -- that was my paraphernalia." Responding to the grandmother's testimony about her appearing to be under the influence of drugs during a virtual visit, Mother testified, "The only time we ever, I think, were groggy was whenever my husband had COVID when he first got out of jail. And, you know, it doesn't matter if I look happy or sad. My mom is going to say it's because of drugs. She always has." And, Mother testified she was employed at IHOP and as a caregiver for her ex-husband, and Ramirez knows where she works.

Mother provided explanations for not completing her family service plan. She testified she completed a psychological and drug evaluation, and attempted to complete parenting courses, but Ramirez was not responsive and enrolled her in the wrong classes. She also testified she started counseling the day trial started, and she tried to enroll earlier, but there was a waiting list, she was moving residences, and then the "COVID thing started and it was very difficult." Mother also explained it was difficult to travel around San Antonio because she did not have a car; Father's truck was impounded when he was arrested. She further explained she did not submit to drug tests because she did not have identification, and she did not get tested when ordered by the court because she was late picking up her son from school.

Addressing her bond with the children, Mother testified: "My children and I have a very close bond. They do with their father as well. We are good parents and I'm not sure how -- I don't know how this has come about that they're terminating our rights. It would be an absolute -- It would be detrimental, I think. Absolutely detrimental." Mother opposed her mom adopting the children because she is a "liar" and "not mentally stable." Mother admitted using methamphetamines in the past, and denied that the glass pipe found in the apartment was used for doing drugs. She also stated she was arrested in 2013 for an "attempt to possess," and at of the time of her testimony, she still did not have identification.

R.R., Mother's seventeen-year-old son, testified he was living with his stepfather, but had lived with the grandmother, and it was not in the children's interest for them to remain with her: "I had gotten into a similar situation where I was taken away from my parents when there was no reason for that to happen, and I was placed in the care of my grandmother." R.R. stated the maternal grandmother treated him appropriately, but the grandmother falsely accused Mother of drug use to have him removed. R.R. testified he lives with Mother and, based on her behavior, does not believe she uses drugs. R.R. also testified Father was not a danger to the children and never witnessed him using drugs, but R.R. was aware Mother and Father were arrested for possessing drug paraphernalia.

Father testified generally that he cooperated with the Department. He also stated Ramirez was twisting his words, and clarified he only admitted to using drugs five years ago. Father explained the glass pipe was from when he was a glass blower five years ago. Father provided explanations similar to Mother's for not engaging in and completing his services, and noted he was incarcerated in Dallas County jail and was infected with COVID-19. Father described his relationship with the children as "[v]ery loving and caring. Like, always took them with me everywhere I went. Like, teach them -- I was -- I would always crawl with them. I would teach them sign language and all kinds of -- like very active in their -- in their lives." Father also stated he was groggy during a virtual visit. However, Father testified he possessed drug paraphernalia, specifically a pen with methamphetamine residue on it, for which he was arrested. He then asserted his Fifth Amendment privilege against self-incrimination and refused to answer further questions.

**B. Analysis**

"When, as here, a child is too young to express her desires, the trial court may consider whether the child has bonded with her current caregivers, is well cared for by them, and has spent minimal time with the parent." *In re S.R.R.*, No. 04-20-00272-CV, 2020 WL 6470202, at *3 (Tex.

App.—San Antonio Nov. 4, 2020, no pet. h.) (mem. op.). It is undisputed that Mother and Father are bonded with the children, and that the children are also bonded with their maternal grandmother.

It is also undisputed that, at some point, Mother and Father both used drugs, specifically methamphetamines. The evidence was disputed about whether Mother and Father continued to use methamphetamines. Under our well-settled standards of review, "the trial court as the factfinder is the sole judge of the weight and credibility of the evidence." *In re J.M.K.*, No. 04-20-00387-CV, 2020 WL 7232133, at \*3 (Tex. App.—San Antonio Dec. 9, 2020, no pet. h.) (mem. op.). And, we must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266.

Father admitted there was methamphetamine residue on a pen in the family's apartment, resulting in his arrest. Mother and Father's testimony also suggested there was methamphetamine or residue in a glass pipe found in the apartment. Mother and Father then refused to submit to drug tests, and failed to take the steps necessary to be able to take drug tests. A factfinder could reasonably infer from Mother's and Father's failures to be drug tested that they avoided testing because they continued to use methamphetamines. *See In re N.N.M.*, No. 04-19-00369-CV, 2020 WL 4808704, at \*6 (Tex. App.—San Antonio Aug. 19, 2020, no pet.) (mem. op.). The grandmother also testified she was familiar with Mother's and Father's conduct and appearance when using methamphetamines, and they appeared to be under the influence of drugs during a virtual visit with the children. Although Mother and Father provided conflicting testimony and explanations, a reasonable factfinder could have resolved the dispute over whether Mother and Father continued to use methamphetamines in favor of the trial court's finding.

Because the trial court reasonably could have believed Mother and Father continued to use methamphetamines, the evidence shows Mother's and Father's use of drugs presented ongoing

emotional and physical dangers to the children. *See* TEX. PENAL CODE § 22.041(c-1)(1) (establishing a presumption "that a person engaged in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment [by] possess[ing], or in any way introduc[ing] into the body of any person the controlled substance methamphetamine in the presence of the child"). The evidence also shows Mother and Father did not complete drug treatment, or other services on their plan, such as parenting courses.

The evidence also shows the children improved in the maternal grandmother's care, and were receiving therapy for their age-inappropriate sexual behavior. Conversely, Mother and Father failed to recognize and minimized this issue. Furthermore, it is undisputed that Mother and Father frequently moved residences several times during this case, at least once due to an eviction. Father was arrested for possessing drug paraphernalia and incarcerated for violating conditions of his probation, on which he was placed for possession of drugs. Additionally, while the evidence of Mother's and Father's employment was disputed, the trial court reasonably could have resolved this dispute in favor of its finding, or not given significant weight to Mother's and Father's testimony, considering the evidence of a lack of support for the children during this case. Having considered all of the evidence, we hold legally and factually sufficient evidence supports the trial court's best interest finding.

CONCLUSION

We affirm the trial court's order.

Luz Elena D. Chapa, Justice